Thank you, your honor. May it please the court. My name is Mark Weintraub from the Federal Defender, representing James Montgomery today. With me at counsel table is Para Olsen, who will be arguing on behalf of Mary O'Connor. And you want to split the time 50-50? I would agree to split the time roughly 50-50, so I will argue for approximately the first 10 minutes. I'd like to reserve a part of that 10 minutes for rebuttal, if I may. This case was complex factually, and the issues on appeal are all over the place. What I would like to do, unless the court has a different preference, is begin by addressing the marital privilege. And I would like to, at some point, get a chance to address Blakely and its application to the sentencing issues that we've raised. In particular, with regard to that, the record below, because the record below is pertinent there. Blakely is a topic for a month's seminar, so it may be best for us to save Blakely and its application for further briefing, if we want. If that's the court's preference. We may ask a question or two, but I encourage you not to spend the bulk of your time on Blakely. I'm really interested in the marital privilege question. Let me go straight to that. The trial court should not have permitted Louise Montgomery to testify about what she said and wrote to her husband. Here, the government used the power of the state to compel a wife to break the privacy of conversations with her husband. The Supreme Court, as well as this court, has recognized that that is wrong. Well, she made, apparently, a decision in her own self-interest, as an indicted co-conspirator, to cooperate. And the price for that cooperation was to waive the privilege. The question is whether or not she could waive her communication to her husband, or whether, under federal common law, the husband could block her testimony, notwithstanding her willingness to waive it. If you can help me with authorities, we've done a fairly extensive survey of the case law, or excuse me, the statutes, all over the United States. And the statutes are as varied as the answers that I anticipate to the question, I suppose. What is pertinent here is federal common law, not the statutes in the various states. And unfortunately, if you survey the federal case law across the circuits, there is some confusion. And I think that the primary reason for the confusion has been that the difference has not always been well understood between the testimonial privilege, on the one hand, and the confidential communications privilege, on the other. So let me address the distinction between those two, because I think that it then clears up some of the other issues. The testimonial privilege could have been before the court in this case, but it was not, because it belonged to the testifying spouse, in this case, Louise Montgomery, and it was hers to claim or waive. She chose not to claim that for reasons relating to her own self-interest. The confidential communications privilege is fundamentally different, first of all, because it belongs to both spouses, and either one may claim it. It's not sufficient for one to waive it because the other may claim it, and this court said that in a grand jury investigation in 1979, which is cited in our reply brief. Here, Louise Montgomery chose to waive that privilege. That was her prerogative. However, she did not have the prerogative to waive James Montgomery's privilege, which he claimed, and he claimed it over and over and over again in pretrial motions right up to the course of trial. Does it make a difference who the declarant is? It does not, and again, I believe that the trial court in this case, in accepting the government's argument on that point, was confusing the two privileges. Well, the question is whether James can block Louise who's willing to waive it. Isn't that the... There is no case law that says that he cannot. None. I'm sorry. There's no case law that says he can. There is no case law that contradicts Mr. Montgomery's position on that. None. What creates some difficulty, although I don't think it's a major difficulty, but what creates some difficulty is that the facts here are unusual. In the typical case, it is the testifying spouse being asked to testify about some incriminating statement that the defendant's spouse said, and that is how most of the cases that have gone up on appeal on that issue, that's been the fact pattern. Here we had the opposite, where the testifying spouse is being asked to testify about what she said. Professor Kirkpatrick addressed that issue directly in his treatise, which we've also cited, and disapproves of any suggestion that what happened here was okay because, as he describes it, it allows the government to try to prove circumstantially what it's clearly not permitted to prove directly, which is what James Montgomery said or intended in response to what his wife said to him. Is that it, or is it the government introduced the note to show notice to James that his sister was engaged in fraud and that thereafter he took no action to stop the sister from doing what we suspected she was doing? I can't speak to the government's intent. All right, well, I'll ask the government when he's up. But it is clear that that is the only evidence that was before the jury, that James Montgomery was on notice, that his wife believed that his sister was committing a fraud against the custody. So your argument really has to come down to either James has the ability to block Louise from testifying or he loses. He does have that ability. Because it's not his admission that she's testifying. Well, clearly he does have that authority to assert the privilege. The case law is clear on that. What's your best case supporting his ability in federal court to block her from testifying? I'm not certain because the cases – You're not certain what your best case – I'm not certain what the best case is because the cases don't address this fact pattern specifically. There is a case that we've cited, and I may be able to turn to it, that tells us that either spouse holds the privilege with respect not only to his or her own statements, but also to the other spouse. Kirkpatrick is clear on that. What do we do with the language of our opinion in United States v. Figueroa? Pause. And I'm referring specifically to page 1057, 1058. Sure. 468F, second, where Judge Carter seems to suggest that the marital communications privilege belongs to the communicating spouse and likewise may be weighed. Bear in mind that it was the communicating spouse there was the defendant, not the testifying spouse. And that defendant waived it. But would it be a stronger case if the testifying spouse is the declarant and is willing to waive because she wants to testify to what she says? No, because the principle is the same. a semi-sacred relationship, the confidentiality of which the law respects, with a privilege which is as strong as any, if not stronger. And it doesn't matter who is the speaker. It doesn't matter who is the witness. Both spouses have the right to claim privilege as to what occurred between them. By my research, there are some 35 states that support your view and 15 which do not. But as you pointed out at the beginning of your argument, it really doesn't matter what the states say. The question is, under federal common law, what is the rule? And I'm having a very hard time. I have to say, I thought the privilege was as you are articulating it until I started researching it, and now I'm not so sure. I believe the only way you can get to the contrary view is through a misreading of the cases, as I believe the government has done here, beginning with Figueroa Paz, in which the real issue was whether an objection to a joint trial had been waived. And we laid this out case by case in our reply brief as to what the underlying facts are. I need to defer to my co-counsel, if I may. What I'd like to do is reserve a minute or so for rebuttal. We're not going to cut the argument short if we need to hear things. Thank you. Why don't you sit down with your co-counsel and let you have some time. May it please the Court, Perry Olson representing the defendant, Mary O'Connor. I'm going to switch gears entirely and talk primarily about the conspiracy to commit mail fraud count, count one, as well as the variance issues, because there's a lot of overlapping issues there. At issue in this appeal is whether the government may obtain convictions for the federal offense of mail fraud, where the government's best case suggested that the defendants conspired to offer complimentary uses and engaged in personal uses of vacation rental units at Sun River, Oregon, and then mailed to owners of these units monthly statements that did not disclose those particular uses. Isn't that the dog that didn't bark? They didn't use the mail if they didn't send the statement. Well, that's right. I mean, that's essentially what the government's case is, is there were statements or disclosures that were not made, therefore not sent in the mail. We contend that the conspiracy count is flawed for two fundamental reasons, and these flaws relate not only to the sufficiency of evidence claim that we've made with respect to count one, but also the variance slash constructive amendment argument that we've also made. We've contended that the government has failed to prove a form of deprivation to these owners, that it alleged in the indictment, in paragraph 14, it failed to prove that any complimentary use or personal uses of these rental units deprived the owners of legitimate income from renters. Is that the theory, or the theory that the statements that were mailed to the owners were false, as set forth in paragraph 12? That's the other flaw that I was going to get to. The other flaw in the government's case is that these statements were not false as alleged. The government alleged that defendants sent out false statements that were false with regard to rental income, rental dates. Look, the question I guess I'm asking you under variance, if I look at the language in paragraphs 12 and 14 of the conspiracy count, the question is, did you have notice as to what the government was proceeding to trial on, and an opportunity to defend against those allegations? And in reading the language in 12 and 14, it covers both taking money that should have been turned over to the property owners and freebies. So how are you prejudiced by the alleged variance? Well, it covered freebies, but the allegation with respect to freebies and comps were that these uses deprived the owner of money, of income from legitimate renters. So the notice that was given to Ms. O'Connor at the outset of this trial, in the second superseding indictment, was that the government was going to try to prove that these comps, freebies, personal uses, deprived the owners of rental money from legitimate renters. And what changed through the course of the trial is that by the time we get to the closing argument, the prosecutor stood up and said that the deprivation was in the form of these owners not being able to use their own units. And the prosecutor in his closing argument even anticipates what the defense is going to do in their closing argument. He says, well, the defense is going to stand up and say there was no deprivation of money. There's no theft of income here. And the prosecutor says, well, that's just a legalistic argument. And when you contrast that statement to everything that had come before in pretrial motions, in the superseding indictment itself, in Government Exhibit 1-1, this case was about stolen rental money. Stolen rental money or depriving the owners of reasonable compensation for the use of their property. Why isn't that subsumed within the allegations of the conspiracy? Well, that's very different from what it says in paragraph 14. It says that they were materially at fault in that the defendants only withheld information such as the nights the number of units were rented, et cetera, et cetera. And I guess my question is why can't that include failing to tell the owners that we're using your unit and we're not paying you for it? Well, the question becomes, though, is this mailing the vehicle for disclosing that? Well, is that a materially false statement? Isn't that sufficient to establish conspiracy and mail fraud? Well, our position is that this nondisclosure, if you will, this nondisclosure of these uses was not materially false because the purpose of these monthly statements was to inform the owner of rental activity. And there was testimony about how the process in which these monthly statements were created. Was there testimony by any of the owners that they wanted to know if their units were being used? Yes. Yes. But they did not testify that I wanted to know on this monthly statement. There's no evidence to say that this monthly statement was the vehicle for informing them. How else would they know? They could have called them up on the telephone and told them. You know, this is a mail fraud case. This is a case where the government... I understand, but I'm having a hard time understanding why that still doesn't constitute mail fraud. But if the principal means by which the owner is notified of the use of his rental unit when he lives a thousand miles away is through monthly statements that the defendant's realty company sends, and those statements are false because they don't accurately report how the unit has been utilized, what's the problem? That's fraud to me. I'm missing something here in your argument. The evidence was that these statements were not used to report how the rental unit is being used. These statements were used to report to the owner income received on the property. And not only income received, but deductions for cleaning fees, snow removal, and all these other things. So it was essentially an accounting device. But you're completely disregarding, I guess, in what you're urging that we interpret the fraud to be. You're completely disregarding that the owners... that there's wear and tear on the units as a result of the fact that the owners... that people are staying there for free and they're not being paid for those visits. And you've got testimony at the trial that the owners would have wanted to know that. Again, Your Honor, I think what we're talking about here is a false statement by omission. The question is, is it material, right? You admit that it was omitted, that that information was not disclosed. The question is, is it sufficiently material to constitute mail fraud? I don't think it is because of the purpose of these statements. And in our reply brief, we've also cited authorities to the effect that if it's a falsity by omission, in other words, if it's a failure to disclose, a failure to disclose is actionable under the mail fraud statute only if there's a fiduciary duty of some sort or a statutory duty to provide that information. Well, isn't there some sort of duty, whether you call it fiduciary, statutory, or contractual? There is a duty here by these defendants to manage these apartments and so on. If I were an owner of a unit and I discovered after a year that there had been five free uses, meanwhile they're reporting to me all the time what's going on with respect to rental units, rentals and costs and so on, I think I would feel that my expectations of what those people were doing and what my contract with them had been violated. Your Honor, that may very well be the case, but the question is, is this a mail fraud? Is this a document? Well, I understand that, but I'm trying to figure out, first off then, what was the responsibility of the management company toward the owners of the units? And I think the responsibility included an accurate reporting of these free uses. And for them not to say it violated the agreement that they had. Well, there's certainly nothing expressed in the agreement that sets that out. There's nothing in the agreement that expressly says the owner shall be notified of any and all uses of the property. And the contract is in the agreement. Is there anything in the agreement that says the management company has the ability to let people into the buildings and use them for free without permission of the owners? I don't believe there's an express provision on that. It sounds like trespass. What right do they have to go in there to either themselves or with people that they authorize to be there? It may very well be trespass, but it's not mail fraud. But if they have an obligation to report, and you're saying that they had no obligation to report that they were trespassing in violation of their contractual arrangement? Certainly. I mean, there's nothing in the contract that said that. There was no testimony where anyone said that there was an unspoken or unwritten rule in that regard. And I do want to, just briefly, I do want to stress that there is a huge variance issue here. And it's brief throughout. I don't really need to elaborate it, but the key variance here is the difference between how the government alleged deprivation of, by virtue of these comps and freebies. I see my time's up, so. And we'll give you a minute or so to run if you need it. Good morning, Your Honors. My name is William Fitzgerald. I represented the United States in the trial in the district court in this case. It sounds from the questions proceeding that the court is particularly interested in two issues, the marital privilege issue and the variance issue in this case. So I'm going to try to focus first on those two issues and then address any questions that the court may have about any other issues in the case. Let's start with the privilege issue. A couple of points need to be made here. First of all, that the marital privilege has no constitutional underpinnings. That's the Lefkowitz case, which is cited in the government's brief. The courts disfavor it. It's narrowly construed because it obstructs the truth-seeking process. And that's the Marashi case, which is also cited in the government's brief. It only protects communications which are intended to be confidential. Cited to Herrera, Lefkowitz, McCown, and Marashi. Well, this Dear Jimmy letter, apparently pencil-written, appears to be pretty confidential. Well, Your Honor. From a wife to a husband. There are a couple of points about that. First of all, when Louise Montgomery was asked at trial whether she intended for that letter to be confidential, she responded point blank, no, I was hoping that he would communicate it. Well, she'd already made a deal with the government, hadn't she, then, to be a friendly witness. So what is that worth, that self-serving statement? I'm sorry, there was another. There were two questions. I may or may not have brought the proper excerpt up with me. When you say, do you have a page reference to the question and her answer when she says, no, I did not intend it to be confidential? I believe that is in my brief. I did bring your brief up. And let me see if I can find that for you. What precisely did she intend to be confidential? Is it the information contained therein? Is it the letter itself? I mean, there are different questions. Do you have the text? Sure. Where is it? This was the record of trial, page 589, and it's in the government supplemental excerpt record at page 60. And the specific verbiage from the government's brief is, when asked about whether she intended for her husband to keep the information in the letter to himself, she replied, no, I was hoping he would communicate it to his sister. And I'm sorry, what page are you on in your brief? This is page 35. Page 35. Oh, I see. No, I'll just have to go back and look at this You've paraphrased the question. I've only given the direct quote from the answer. Okay. And so to answer Judge Goodwin's question as to whether or not it was the information contained in the letter itself or the letter which he intended that he would communicate to his sister, the government's position is that it doesn't matter whether it was the letter itself or the information contained therein. So it appears that that's one point of contention between the defense position and the government, is that if she intended for James Montgomery to communicate the contents, the substance of that information contained in the letter to his sister, then that would mean that she did not intend to keep it confidential. It doesn't qualify as a confidential communication. I've just found the transcript. You quoted it correctly. It is information. Is it the government's position that there was no error in letting this letter come in and therefore you don't address the question of whether it was prejudicial? That's correct, Your Honor. Because it does appear on its face to be highly prejudicial on the issue of the conspiracy. It would be the smoking gun connection with the conspiracy. Yes, I agree with that. I think you argued that to the jury. Yes. And the authority that I would cite for the government's position as to whether or not the contents of the letter, as distinguished from the letter itself, makes a difference, I would point to a case outside the circuit, Grohlke v. United States, which is cited in the McCown decision, which is an I circuit decision. And in 1968, the 8th Circuit decided that the communication of a letter to a wife was not intended to be confidential, where the husband knew that the wife had difficulty reading and anticipated the need for a third party to read it to her. But here, let me say, this is an analogous situation. Let's say there's an oral communication. She says to the husband, listen, I think your sister's stealing. In fact, I know your sister's stealing. And you're not doing a darn thing about it. Don't tell her that I told you. But I want you to know that I know that she's stealing, and I want you to go tell her that you know that she's stealing. Now, obviously, she's said, I don't want you to tell her what I've told you. That is to say, keep me out of it. But in fact, I want you to know this information. I want you to communicate the information to her that she's stealing, and you know it. Why is this letter different from the scenario that I've just given you? I understand that question, Your Honor. And first off, I would note that there's no evidence that she told her husband, don't reveal my identity as a source of this information. But the second is when you examine the content of the letter itself, it is clear that she's giving her husband an opportunity to clear this matter up with his sister. And if he doesn't do it, she's going to do it for him. She says, if you don't address this issue, I'm going to talk to your sister myself. So I don't think she's concerned about, it doesn't sound to me like she's concerned about her identity being revealed to her sister. And it's also important to understand that at this point, and actually at all points throughout, relevant points throughout this case, there was no real relationship in the sense of a personal friendship between Mary O'Connor and Louise Montgomery. They did not like each other at all. Why is that relevant to the marital privilege question? Well, it's relevant to the marital privilege question because Louise Montgomery wouldn't be concerned about her husband telling his sister that she was the one that was casting aspersions at her, that was alleging that she was ripping off the client. She wouldn't be concerned about that because she wouldn't be concerned about her reputation with Mary O'Connor. So that's the government's first argument, is that this letter and the contents therein are not intended to be confidential. What's your best argument for why James can't still block Louise from testifying, even if she wants to, to better her position vis-a-vis the government? That's where the government has to look at the Ninth Circuit case law, which it cited in its brief, which is the Figueroa case. And in that case, the Ninth Circuit held that the privilege protecting marital communications belongs to the communicating spouse and may be waived. Now, what's important about that statement and that opinion is that the Ninth Circuit discusses both types of privileges in that case. So it is clearly aware of the fact that there are two types of marital privileges, the one which is the adverse spouse privilege, which would allow basically the privilege that Trammell addressed, the Supreme Court decision, which says that a spouse can neither be compelled nor cannot be compelled to testify against the other spouse, but can do it willingly. Mr. Fitzgerald, I'd be with you if it weren't for the fact that Judge Carter, in talking about the marital privilege, and I'm looking now, I guess, at page 1057, talks about the privilege which prevents one spouse from testifying adversely to the other, but it may be waived, whereas here, neither spouse raises the privilege when the testimony is offered. And then he goes on to say that in this case, to object to his wife's testimony as to his communications when it was offered. Here, there is no question that James objected vigorously to all efforts by the government to introduce this evidence. And so I don't find much support in figural pause for your argument that it is still admissible over the husband's objection.  And I would say that the facts in figural pause were different in that in the figural pause case, it appears as though the spouse was testifying about the statements made by the defendant. And in this case, in the Montgomery case, Louise Montgomery was testifying about her own statements, which makes it a slightly different fact. And in figural pause, there was no objection, but here there was. So I'm not quite sure what to do with that. I mean, one fact helps you, one fact hurts you, but I'm not sure figural pause gets you as far as you need us to get. Let me ask you one follow-up question. That is, is it the government's position that this communication somehow meets the joint participant theory with regard to the fact that they were both involved? That's not the government's position, Your Honor. I looked at the Marashi decision and I studied it carefully, and it is clear that that decision is intended to address statements which are made in furtherance of joint criminal activity. In this case, I don't think there's any way you can read that letter and interpret it as being a statement in furtherance of the joint criminal activity. In fact, she's calling it to the attention of her husband, and she wants it to stop. So I think the only other position this government could take is that she was an accessory after the fact, and I cited the Neal decision in my brief. For the proposition that when a wife learns of a husband's criminal activity, as was the case there where she is party to the admissions of her husband about a bank robbery, and then subsequently enjoys the fruits of those crimes and, in a sense, ratifies them. She's an active participant after the fact. Correct. And in this case, Louise Montgomery, after putting up a valiant fight here with her husband, decided to do the same thing, and, in fact, what we have in our case is a series of crimes committed by Louise Montgomery after this attempt to try to get her husband and her sister-in-law to stop their criminal activity. Which is what got her indicted. Exactly. So I'm calling that case to the court's attention as well as the third rationale in support of the government's position on privilege. Are you going to help us understand why the proof and the indictment seem to be talking about two different subjects? I am, Your Honor. The variance point is one which both parties have devoted a substantial amount of time to in briefing. It's important to note here that the government did not play hide-the-ball with its theory of the case. As the court has already noticed, the indictment does allege, if you want to call it complementary use, I think that's kind of a nice term to use for helping yourself to your client's property and then not telling them about it. Would it be fair to say, though, that in your opening, and I've read your opening and your closing, that you expected that the evidence would be stronger with regard to the pocketing of money that should have been turned over, but that by the time you got to the end of the trial and you made your closing, the evidence did not come in as strongly as you had hoped on that theory and that you emphasized in closing the complementary use and the failure to tell the owners? That's a very good read, Your Honor. I think also I was concerned that in the opening statement I didn't want to say too much. In other words, there was a lot to talk about with regard to this case. I wasn't going to say it all in the opening statement. I was going to hit the hardest point, which was that these defendants were diverting rental receipts from their clients. Now, the indictment told the rest of the story about these unauthorized uses by the defendants, and depending on how the evidence played out at trial, I would address that in my closing. So I'm not aware of any case that would call a variance or that would hold a variance where the prosecutor's opening statement is somehow incomplete or varies from what the closing argument ultimately turns out to be. A variance becomes a problem when the evidence is different from the theory in the indictment. Of course, there are two problems that I'm having with it. One is that, well, I've tried a few mail fraud cases myself as a trial judge, and I looked at a lot of them on appeal, and usually the mail is used instrumentally in some way to perpetrate the crime. And as I understand your theory, the conspiracy was to withhold information, send the regular routine mailings to the owners to account for how the property was being managed and so on, and that the falsity or the fraud consisted in not disclosing information that, in a full faith and credit fiduciary relationship, would have been disclosed. So you have to prove that the mailing was used instrumentally to lull the homeowners into thinking that they were getting full information when, in fact, they weren't, and that that was the fraud and that was how the mail was used instrumentally. And I'm having a little trouble with the absence of anything fraudulent. You don't have an exhibit or a letter that was actually false. It was just a nondisclosure. It was what was left out or the dog that didn't bark. And I was wondering how you'd get the fraud in the mail. It's almost as if they had hand-carried the stuff to Seattle and Oxnard and Ventura and wherever these people live and hand-carried a note saying, here's your accounting for the property. And then you wouldn't have any mail fraud case at all. You'd just have a good old common law, state law fraud case. Well, that's exactly right, Your Honor. I would agree with you to a certain extent that this was a case about material submissions from those monthly statements, but it's also a case where if the clients are under the belief that the reports that they get from their property managers are complete and accurate and if those reports tell them that their particular unit was used, for example, three times during the month and, in fact, the correct number is four or five, then the representation that their unit was only used three times during the month is, in fact, a fraudulent representation to that client. It doesn't matter whether the use was from a paying customer or from the defendants themselves or their acquaintances. That is a false and fraudulent statement in front of the client. Am I right in thinking that you did not put in any evidence that during the relevant period these people who had made the unauthorized stays of the property paid money over to the management company? All you have is evidence of staying? Is that right? Well, actually, that's not true. Is there evidence that they were being paid for these stays? There was evidence that during the relevant period, and when I say the relevant period, I'm talking about the period of the conspiracy. So it really depends on which period you're referring to because during the period of the conspiracy, the entire three-year period, the crimes shifted from taking money from paying customers and not telling the owners about those receipts and deleting any record from the computer of any of those. It went from that to in August of 1994, when Louise Montgomery took over the monthly statements. After that time, what we're talking about is we're talking about one-night rentals, which Louise Montgomery said, those were kind of annoying. The owners, it's such a small amount they really don't care about. She was making the decision herself that a one-night rental, that's money received, and the owners really didn't care about that money. That was not what the owners said. And we also had situations of freebies and complimentary uses where people stayed in these units at the behest of the Montgomerys. Now, in one case, the Yellow Pine 16 case, which underlies Overt Act No. 11 and Count 8, of which Mr. Montgomery was convicted, in the case of Yellow Pine 16, there was a period of well over a month where people stayed in that unit. These were people that were doing work on Mr. Montgomery's property there, construction work. They stayed in that unit. We had testimony at trial that a check was delivered for those services and that use was not reported on any monthly statement. Did you say a check for those services, a rental check? Yes. And yet the monthly statement for that period of time was silent as to that use. I guess we're here for the moment. Could I ask you one more out-of-time question? Just to take one example, what was the proof that connected Jim Montgomery with Count 9 of the indictment? That was one of the counts in which he was convicted, I believe. Yes, Your Honor. Your Honor, with regard to Count 9, that was the Meadowhouse 29 incident where the evidence was you had a reservation board which showed that the unit had been cleaned and was ready to go. You also had a reservation record which had penciled in the words, SR Chamber, Sun River Chamber. And we had Louise Montgomery's testimony that she allowed Shirley Walton of the Sun River Chamber of Commerce to stay at Meadowhouse 29 free of charge. The evidence that connects James Montgomery to that is that Louise Montgomery, in her testimony, made it clear that complementary uses were well known to all of them. In other words, she directed some of them and James Montgomery directed complementary uses, as did Mary O'Connor. So the theory would be several-fold. One is that it's a circumstantial case against James Montgomery as the president of the company. The second would be a Pinkerton liability theory, whereas any crime committed by any of the co-conspirators during an inference of the conspiracy would be a crime committed by all conspirators. And in that vein, the jury could well have found that any of the crimes of conviction, which are attributed to James Montgomery, could have easily been determined. Would that theory apply to each of the counts, then, where there was a conviction, where the jury found guilty of the conspiracy? I'm sorry, did I? Would that same theory apply to all of the counts where there was a finding of guilt? It would, Your Honor. So it's the derivative guilt of being in charge of the operation and maybe knowing about each unit, but maybe not knowing about each unit. That's correct. In other words, in this case, one would say, well, Louise did it, but James knew about it, or at least he was managing the business. In the absence of proof of knowledge, the government would rely on Pinkerton liability. But that is the classic Pinkerton theory of conspiracy liability, isn't it? That's the textbook example. It is. My understanding of Pinkerton is that a crime committed by a co-conspirator need not have been known about by the other. So long as it was of the type within the scope. Reasonably foreseeable. Exactly. Okay. Those are the only points I wish to make about the variance and privilege issues. I'd be happy to address any other questions the Court has in the time remaining. Pretty well. Thank you. Thank you very much. Now, let's have a little rebuttal first on behalf of Mr. Montgomery. Set it for a minute and then we'll run over. Thank you. I'll try to try to be quick. Let me say one thing about Yellow Pine 16 and then move back to the privilege again. Yellow Pine 16 is the only instance in which rent money was proven to have been collected within the statute of limitations period. That's county. That was just referred to with the workers who stayed in the house for about a month. But that's all they need. In other words, if they prove one overt act within the period, then you can nail them for all the others. This is my point, is they didn't prove it. The owner of Yellow Pine 16 did not testify. There was no evidence, therefore, that the owner did not know about the rental or was not paid for it. And, in fact, there was overt evidence that was not contested, that the owner of Yellow Pine 16 was paid within that time period well in excess of what was shown on the monthly statements. So the only reasonable inference from that is that Yellow Pine 16's owner was paid, and the government put on nothing to remind them. But, Mr. Weintraub, if the law says that all that is required is one overt act within the period of the statute of limitations, it doesn't have to be a criminal act in order to save all of the other overt acts, which might be separately criminal but not prosecutable substantively. I don't quarrel with the court there. My point is that they didn't prove that this was an overt act that furthered the conspiracy in any way. Well, it's alleged as an overt act, is it not? It's alleged, but it was not proven, is my point. It was simply not proven. Moving back to the marital privilege, I think it's critical to note that Judge Hogan agreed that the privilege applied, which resolves any underlying factual controversy there might have been about that. Now, counsel brings up, I think for the first time today, the idea of an accessory after-the-fact theory that would negate the privilege. Judge Hogan ruled that the privilege applied. He simply misapplied the privilege by allowing one half of the communications but not the other half. He agreed the privilege applied in the sense that this was, in his view, a confidential communication. Yes. Yes. And he clarified in this is on page 306 in our excerpt, he clarified that he was relying on the Ninth Circuit case, referring to Figueroa, and then he clarified for the government, Mr. Fitzgerald said, I wanted to make sure that we don't get any testimony from her about Mr. Montgomery's, about what Mr. Montgomery's responses were to her concerns. The court said that's right. Is that the judge's ruling, Mr. Fitzgerald asked. Judge Hogan said yes. Judge Hogan accepted that the privilege applied. Well, the privilege applied to protect against his admissions, right? Well, either it does or it doesn't. The court asked about our best case. I'm not sure it's our best case, but it's a case that the language of which goes directly to this issue, and this is the in-rate grand jury investigation decision from the circuit in 1979. It was Judge Pufstedler's opinion. I note that Judge Goodwin was on the panel. The court said the marital communications privilege permits either spouse or ex-spouse to assert the privilege to bar testimony concerning confidential communications between the spouses during their marriage. I don't think it could be any clearer than that statement, that this is something either spouse can assert. It applies to communications between them, and that means that Judge Hogan was wrong. I don't have the full text of that grand jury case in front of me, but I've got an excerpt from it. It says the privilege may be raised by a spouse who is not the witness. Yes. That's this case? Yes. That's correct. And then finally, I believe the court did correctly focus on the distinction between the letter and the information in the letter. In her trial testimony, and this is in the government excerpt, also in ours, that 160, Mr. Fitzgerald asked Louise Montgomery quite specifically, did you intend for him to keep that information to himself? And she said, no, I was hoping he would communicate it to his sister, referring clearly to the information in the letter, not the letter itself. And the letter, if you look at it, is from top to bottom private in many different ways. It contains information that no one would want to be public. It identifies her as the accuser against the sister. But in light of her testimony, how can we conclude that she would object to having that communication shared with the sister? It seems to me you'd have a much stronger argument if she said, no, I wanted him to confront my sister-in-law, but I didn't want him to tell her that I was the source of the concern. There are two responses to that. One is that this letter was written in August 1994. Her testimony didn't occur until about 18 months ago. But don't we have to view her testimony in the light most favorable to the government since we're here on conviction? So I can't draw the inference the other way. Well, I don't think there's an inference to be drawn from what her testimony was here. But beyond that, we did submit an affidavit from her that clarified what her intent was. She was quite clear in the affidavit that she did not want Jim to show his sister or anyone else the letter. What she wanted was for him. When was the affidavit submitted? Do we have a problem like we do in civil cases where you've got deposition testimony, but then the declarants of it's an affidavit saying, well, I never meant to say that. The affidavit was submitted after trial. And bear in mind that before trial, she was not only a defendant but was represented by counsel. The case against her was not dismissed until after she testified. After that occurred, we were able to talk with her directly, and she provided us with that affidavit. Thank you very much. Thank you very much. And Mr. Olson. Just briefly, one more point on yellow pine. Mr. Weintraub said there was no proof as to that overt act. And the overt act says that the owners were not provided notice and were not paid for that use. And just to draw out Mr. Weintraub's point, the evidence was there was no evidence that the owner was not paid. She was not called as a witness. And Mr. Weintraub in his brief talks quite thoroughly about the evidence on that payment. There was a post-trial or whatever it's worth, there was a post-trial affidavit filed by the owner in that case saying that she likely was paid. The other point on yellow pine is that the government has admitted that when Louise Montgomery came back to the business, the conspiracy changed. This is the government's position, that the conspiracy changed to one of comps and freebies. Mr. Olson, can I go back? Yeah. Were there substantive freebie counts of mail fraud that were within, not barred by the statute of limitations, which were overt acts? Well, for example, I'm trying to remember if it was freebies specifically. There were personal uses that were alleged as overt acts and substantive acts within the statute of limitations. So if the jury found an overt act involving a freebie, doesn't that save the conspiracy count from the statute of limitation argument that I think you're making? Well, apart from all the other flaws that I have with respect to whether a freebie or a personal use can be part of a mail fraud. Right. Yes. But assuming those other asserted errors aside. But again, with respect to those personal uses, our position, of course, is that there was no mailing that was associated with those uses that was part of the mail fraud statute. And also, just briefly in response, I didn't quite catch Mr. Fitzgerald's answer about evidence about whether the defendants got paid for any comps or freebies. Our position is that there is no evidence that the defendants got paid anything by anybody for comps or freebies. In fact, they paid the cleaning fee that were associated with those. The last thing I want to stress is that my briefs kind of leave open the question of whether this is a variance or a constructive amendment. And I just want to make clear, because my briefs don't make clear, my position is this is a constructive amendment. And the reason for that is twofold. There were more than one variance at issue here, as I've discussed in my brief. And also, when you consider how the case changed from beginning to end, there's a real question here as to whether the grand jury would have returned an indictment in the format alleged or argued by the government in closing. And that's all I have unless the Court has other questions. Thank you very much, all counsel, for your helpful argument. The case of United States v. Montgomery is now submitted. And the last case in our argument panel this morning is United States v. Armstrong. Thank you.
judges: Goodwin, W. Fletcher, Tallman